UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JAY BLAHNIK, INC. : |
|       Plaintiff, : |
| : |
| v. :    C.A. No. 21-cv-26MSM |
| : |
| WATERROWER, INC. and : |
| WATERROWER UK, LTD., : |
|       Defendants. : |

### REPORT AND RECOMMENDATION REGARDING DAUBERT MOTION TO EXCLUDE REPORT AND TESTIMONY OF CATHERINE PARENTE

PATRICIA A. SULLIVAN, United States Magistrate Judge.

This federal copyright infringement case is asserted by Plaintiff Jay Blahnik, Inc ("JBI") against Defendants WaterRower, Inc. and WaterRower UK, Ltd., (collectively "WaterRower").[1] Now pending before the Court is the motion to exclude JBI's damages expert, Catherine Parente's report ("Report") and testimony pursuant to Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993) ("Daubert"). ECF Nos. 56, 61 (sealed version); see also ECF No. 56-1, Declaration of Sara Lonks Wong, Esq. ("Lonks Wong Dec."), Ex. 1. The Daubert motion has been referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).[2] WaterRower relies on its Daubert argument to support its contention that the Court should enter partial summary

---

[1] The parties have used the more precise "WaterRower US" to refer to WaterRower Inc. and "WaterRower UK" to refer to WaterRower UK, Ltd., as appropriate. Finding that the distinction is not generally material to the issues pertinent to this Daubert motion, I have used the collective moniker, WaterRower, recognizing that my usage may be technically inaccurate in that sometimes I have used it to refer to actions that relate solely to WaterRower US and sometimes solely to WaterRower UK. When the distinction is material, I have used WaterRower US and WaterRower UK.

[2] During argument on the motion, I asked the parties to file post-hearing letters regarding whether this Daubert motion should be addressed in a report and recommendation or for determination in a memorandum and order. Because it was referred for report and recommendation, JBI argues that it should be dealt with pursuant to 28 U.S.C. § 636(b)(1)(B). ECF No. 85. I agree and have issued this decision as a report and recommendation subject to *de novo* review. Tige Boats, Inc. v. Interplastic Corp., No. 1:15-CV-0114-P-BL, 2015 WL 9268423, at *3 (N.D. Tex. Dec. 21, 2015) ("starting point in any analysis of an action by a magistrate judge is the scope of the specific referral") (internal quotation marks omitted).

judgment in its favor because JBI cannot prove damages. Having reviewed the parties' submissions and arguments, I recommend that the Daubert motion be denied in part and granted in part. The related summary judgment argument is addressed in a separately issued report and recommendation. ECF No. 86.[3]

## I. Background

Catherine Parente is an impressively credentialed CPA with extensive experience in public accounting, including testifying as a qualified expert in many business disputes regarding valuation and damages. ECF No. 61-1 at 14-23. In reliance on 17 U.S.C. § 504(a)-(b), her opinions for this case pertain to JBI's "actual damages" resulting from WaterRower's alleged infringing posting of the accused How-to-Row Video on its YouTube channel and on public databases from March 2019 through December 2020. As a yardstick to set a "reasonable license fee" on which she bases her calculation, Ms. Parente relies on the commission rate set by the 2013 License/Commission Agreement between the parties that terminated in September 2017. Lonks Wong Dec., Ex. 1 ¶ 50.

WaterRower argues that Ms. Parente's opinion is based neither on reliable principles and methods nor on sufficient facts or data. Specifically, it contends that:

1. The opinion illogically calculates a hypothetical royalty rate for WaterRower's use of the accused How-to-Row Video based on all of WaterRower's sales of all products and actual commissions paid for a specified period, despite acknowledging that the commissions pursuant to the 2013 License/Commission Agreement were not based on all sales of all products, as well as that the 2013 License/Commission Agreement covered far more than a license to use the alleged copyright-protected Indo-Row Video;

2. ███████████████████████████████████████

---

[3] The reader's familiarity with the background in the report and recommendation (ECF No. 86) is assumed.

      3.      The opinion inappropriately inflates the commissions actually paid under the 2013 License/Commission Agreement by adding the amount WaterRower paid to settle a Rhode Island Superior Court Lawsuit between the parties despite the 2020 Settlement Agreement's recitals that the settlement was to "resolve the Lawsuit fully and completely without further expense," as well as that the settlement was a "compromise of disputed claims" and that the "payment made is not to be construed as an admission of liability" by WaterRower. ECF No. 58-1, Declaration of Benjamin M. Stern, Esq. ("Stern Dec."), Ex. 22 at 2 & ¶ 7.

## II.    Legal Standard

In considering WaterRower's Daubert motion, the Court must determine whether the proffered expert Report/testimony meets the requirements of Fed. R. Evid. 702 in that the opinions are based on "sufficient facts and data" and on "scientific, technical, or other specialized knowledge [that] will assist the trier of fact." Daubert, 509 U.S. at 588 (internal quotation marks omitted). Rule 702/Daubert requires the Court to act as a gatekeeper to "ensur[e] that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 (1st Cir. 2012) (quoting Daubert, 509 U.S. at 597). Reliability and relevance are separate and distinct inquiries. Id. The party seeking to introduce expert testimony bears the burden of establishing both. Milward v. Rust-Oleum Corp., 820 F.3d 469, 473 (1st Cir. 2016).

For relevance, the Court must determine whether the testimony "will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592. Thus, "a trial court may bar expert testimony if that testimony will not assist the jury to sort out contested issues." United States v. Mehanna, 735 F.3d 32, 67 (1st Cir. 2013); see also United States v. Navedo-Ramirez, 781 F.3d 563, 568 (1st Cir. 2015) ("If a layperson is capable of understanding an issue without the aid of an expert, a district court may properly decline to admit expert testimony on that issue on the ground that it would not be helpful to the jury."). "The fundamental question

that a court must answer . . . is [w]hether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved." United States v. Shay, 57 F.3d 126, 132 (1st Cir. 1995) (internal quotation marks omitted).

For reliability, the Court has broad latitude to engage in a flexible case-specific inquiry "to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks omitted). "So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process." Lawes v. CSA Architects & Engineers LLP, 963 F.3d 72, 98 (1st Cir. 2020) (cleaned up); see Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Thus, for example, if the factual underpinning of the expert's opinion is weak, that affects the weight and credibility of the testimony – a question to be resolved by the jury. Martinez v. United States, 33 F.4th 20, 24 (1st Cir. 2022). Nor should the Court act as the guarantor of correctness of the expert's assessment. Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998).

If otherwise admissible under Daubert and Rule 702, "expert testimony remains subject to exclusion under [Fed. R. Evid.] 403" if its probative value is substantially outweighed by the danger of unfair prejudice or confusion. United States v. Pires, 642 F.3d 1, 12 (1st Cir. 2011). Exclusion under Rule 403 is "extraordinary and to be invoked sparingly." Rivera-Marrero v.

Presbyterian Community Hosp., 255 F. Supp. 3d 290, 293 (D.P.R. 2017) (internal quotation marks and emphasis omitted).

### III.  Applicable Law

Infringement under the Copyright Act permits a copyright owner to recover "actual damages." 17 U.S.C. § 504(a)-(b). "Actual damages" consist of all income and profits lost as a consequence of the alleged infringement and is generally measured "by the amount that would have accrued to plaintiff but for the defendant's infringement." Rivera v. Mendez & Compania, 988 F. Supp. 2d 159, 172 (D.P.R. 2013). When damages are "hard to quantify," the court may "look to the value of the infringing use (i.e., a hypothetical licensing fee) to determine damages." Id. "Where the infringer does not market and sell the infringing work, but uses it, the analysis is complicated because the court must determine the 'value of the use'"; in such circumstances, an expert may determine fair market value of a hypothetical license by determining what a willing buyer would have been required to pay to a willing seller. Real View, LLC. v. 20-20 Techs., Inc., 811 F. Supp 2d 553, 557 (D. Mass 2011).

This calculation should not be based on speculation to result in a windfall but should be anchored in objective evidence of what a buyer would have been charged for the use at issue. Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 358 (S.D.N.Y. 2003); Real View, LLC., 811 F. Supp. 2d at 557 (hypothetical rate is mere speculation because protected property would never have been so licensed – "it is difficult to fathom any situation in which [defendant] would have given . . . an unrestricted license for a software product"). Thus, for example, if the benchmark agreement grants broader rights, the expert must adjust her calculations. Recursion Software, Inc. v. Double-Take Software, Inc., No. 4:10-CV-403, 2012 WL 1576252, at *8 (E.D. Tex. May 4, 2012). Further, the expert may rely in part on assumptions grounded in her

expertise to extrapolate from objective evidence, as long as such assumptions are explained; in such circumstance, "the district court d[oes] not abuse its discretion in concluding that [the expert's] testimony was based upon sufficient facts or data that result[ed] from the application of reliable principles and methods." D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc., 111 F.4th 125, 141 (1st Cir. 2024) (no error in permitting testimony from expert who assumed rare photograph is worth "between three and five times what a generic photograph would command for the exact same usage") (internal quotation marks omitted). At bottom, the calculation of fair market value of a reasonable license fee may involve some uncertainty and "uncertainty [should] not preclude recovery." Real View, LLC., 811 F. Supp. 2d at 558 (internal quotation marks omitted) (alternation in original).

**IV.    Analysis**

In her Report, Ms. Parente deploys the hypothetical license fee approach, relying on the 2013 License/Commission Agreement to supply the benchmark. Lonks Wong Dec., Ex. 1 ¶ 51. Notably, the use of the 2013 License/Commission Agreement as the benchmark is a judgment with which WaterRower's expert agrees although his very different method leads to a different conclusion. ECF No. 68-1, Declaration of Daniel Johnson, Esq. ("Johnson Dec."), Ex. A. However, this is not a matter of lifting out of the 2013 License/Commission Agreement a simple royalty percentage of all or some subset of WaterRower products sold. As the Report notes, the 2013 License/Commission Agreement establishes a complex commission structure, which provides that WaterRower would pay varying commissions (ranging from 5% to 10%) for the sale of machines branded with Indo-Row marks, for all products sold with an Indo-Row DVD, as well as for specified sales growth of all WaterRower products in certain times and places. Lonks Wong Dec., Ex. 1 ¶¶ 22-23 (generally referencing Stern Dec., Ex. 18 ¶¶ 7.1-7.4). That is, the 5%

6

to 10% commission rate does not purport to be a simple royalty rate.  Further, as Ms. Parente acknowledges, the 2013 License/Commission Agreement's commissions are not based solely on use of the alleged copyright-protected material; to the contrary, the Agreement afforded WaterRower the right to other benefits, including the use of trademarks and programing, as well as the right to appearances by JBI's Jay Blahnik and Joshua Crosby.  Lonks Wong Dec., Ex. 2 at 12-14; see id. at 22 ("it's a package deal").

In developing her approach to address these challenges, Ms. Parente recites in her Report that WaterRower viewed the 2013 License/Commission Agreement as "a business imperative to generate sales," as well as that the Indo-Row Video in issue was financially significant to the overall relationship embodied by the Agreement because it "featured [WaterRower] machines, with the intent to drive sales."  Lonks Wong Dec., Ex. 1 at ¶¶ 18-19.  The Report relies on WaterRower's publication of JBI's alleged copyright-protected Indo-Row Video on YouTube and Vimeo during the life of the 2013 License/Commission Agreement, juxtaposed with WaterRower's post-2013 Agreement emails, in which WaterRower identified the "value" of creating a rowing tutorial video, that the accused How-to-Row Video was to be a "replace[ment]" of and a "macho update" to the copyright-protected Indo-Row Video, which had more than 500,000 views on YouTube before it had to be taken down due to the end of the 2013 Agreement.  Id. ¶¶ 24-25, 41-43.  The Report also relies on the facts that the accused How-to-Row Video was posted on various platforms over an approximate twenty-two-month period, that it was displayed on a WaterRower website that garnered more than 1.2 million visits and that it garnered more than 250,000 views on YouTube.  Id. ¶¶ 44-45.  Based on these facts, the Report notes WaterRower's total sales of "royalty items" for the period over which they were sold, the total royalties paid over the same period; it uses all sales of all products and pro-rated royalties

7

paid during a period for which the information is available – beginning on July 1, 2014, to the termination of the 2013 Agreement – to calculate a hypothetical royalty rate of 1.21%, well below the commission rates (5% - 10%) established by the 2013 License/Commission Agreement.  Id. ¶¶ 51-53.  Notably, the latter rates were applicable to <u>less than all</u> sales and compensated JBI for <u>more than</u> the use of the copyright protected Indo-Row Video.

One wild card that significantly impacts Ms. Parente's analysis is JBI's claim in the Superior Court Lawsuit that WaterRower under-reported and under-paid royalties.  Id. ¶¶ 30-36.  This payment dispute was the catalyst that led to the termination of the JBI/WaterRower 2013 License/Commission Agreement; by the effective date of the termination in September 2017, JBI's complaint for damages arising from underpayment was pending in Rhode Island Superior Court.  Johnson Dec., Ex. C.  The Parente Report notes that the Superior Court Lawsuit ended in a settlement pursuant to which WaterRower paid JBI a sum certain (the "settlement number") that is materially less than the underpayment amount demanded by JBI during mediation of the Superior Court Lawsuit.  Lonks Wong Dec., Ex. 1 ¶¶ 33-35.  Finding that this lesser settlement number is a "more conservative" surrogate for actual commissions owed, and pro-rating commissions to cover an analogous time period, Lonks Wong Dec., Ex. 2 at 26, Ms. Parente uses the settlement number to inflate the "total royalty payments" that she deploys in the arithmetic operation that yields the hypothetical royalty rate of 1.21%.  Id. ¶¶ 52-53.

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ Lonks Wong Dec., Ex. 2 at 15-16.  In her deposition, Ms. Parente testified that she did not review either of these licensing arrangements because the information provided to her about them was

8

sufficient for her to conclude that neither was the product of an "arm['s] length transaction."[4] Id. at 17. Based upon this conclusion, she did not consider them to be "a proxy." Id. at 15-16.

Grounded on the foregoing, with one exception, I find that Ms. Parente's methodology is sufficiently reliable and rests on sufficient facts/data as to permit presentation of her opinions to the fact finder. Thus, unlike Real View LLC., the copyright-protected material in issue in this case was licensed and WaterRower paid for it, albeit as part of an overall package. And unlike, Recursion Software, Inc., 2012 WL 1576252, at *8, Ms. Parente made adjustments, which are explained in light of the much broader rights granted by the benchmark agreement. See Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1330 (Fed. Cir. 2014) (no abuse of discretion to permit expert to rely on overbroad licenses because "differences . . . were presented to the jury, allowing the jury to fully evaluate the relevance of the licenses" – "[n]o more is required"). Further, similar to the expert allowed to testify in D'Pergo Custom Guitars, Inc., Ms. Parente wielded her extensive expertise to make assumptions on which to base these adjustments. ███████

███████████████████████████████████████████████████████████

███████ Skillz Platform Inc. v. AviaGames Inc., Case No. 21-cv-02436-BLF, 2023 WL 8438738, at *2 (N.D. Cal. Dec. 5, 2023). The result of Ms. Parente's work unquestionably involves uncertainty that will be vulnerable to cross examination. Nevertheless, mindful that "uncertainty [should] not preclude recovery," Real View, LLC., 811 F. Supp. 2d at 558, apart

---

[4] ███████████████████████████████████████████

from the exception discussed below, I recommend that WaterRower's Daubert motion to exclude Ms. Parente's Report and trial testimony be denied.

The exception derives from Ms. Parente's troubling reliance on the settlement number to inflate the actual commissions paid. The problem is that the 2020 Settlement Agreement is clear that this number represents not the amount of the underpayment, but rather what WaterRower was willing to pay to "resolve the Lawsuit fully and completely without further expense," as well as that the settlement amount was a "compromise of disputed claims" and that the parties agreed that the "payment made is not to be construed as an admission of liability or unlawful conduct" by WaterRower. Stern Dec., Ex. 22 at 2 & ¶ 7. Even more troubling is that Ms. Parente's opinion that the settlement number is a reasonable surrogate for the WaterRower's claimed underpayment depends on her review of a mediation analysis prepared by JBI's counsel to buttress JBI's demand for compensation made during and as part of the mediation of the Rhode Island Superior Court Lawsuit. Thus, Ms. Parente used JBI's mediation demand to establish that JBI's claimed underpayment was greater than the amount of the final settlement number and to support her opinion that the final settlement number was a reasonable amount to add to actual commissions in calculating damages. This mediation demand – made by a claimant seeking compensation during compromise communications – is not only hearsay with no indicia of reliability, but also is a non-admissible compromise communication pursuant to the Fed. R. Evid. 408, which bars JBI from relying on it to prove the validity of its disputed claim.

To buttress Ms. Parente's reliance on the settlement number, JBI cites a case holding that "[e]vidence that may be admitted to establish [fair market value] includes expert testimony, prior sales history, and evidence of sales of comparable assets . . . as well as the parties' past settlement offers and dealings with each other." Fair Isaac Corp. v. Fed. Ins. Co., 691 F. Supp.

10

3d 974, 997 (D. Minn. 2023) (emphasis added) (internal quotation marks omitted).  However, in neither Fair Isaac Corp., nor the decision to which it points, Jarvis v. K2 Inc., 486 F.3d 526 (9th Cir. 2007), does the court hold that a settlement offer constitutes a "sufficient fact[]," D'Pergo Custom Guitars, Inc., 111 F.4th at 141, on which to base an expert opinion for purposes of Fed R. Evid. 702.  Tacitly acknowledging these problems with reliance on the settlement number, JBI nevertheless argues that the jury can be left to sort it out.

I do not agree.  The settlement number that Ms. Parente extracted from the 2020 Settlement Agreement represents the sole fact establishing JBI's entitlement to payment of more commissions than the amount that it objectively received.  That the settlement number is lower than JBI's inadmissible and inherently unreliable settlement demand does not alter that a settlement number frequently bears little, and sometimes no, relationship to the amount that might ultimately have been awarded by a fact finder.  In the circumstances here, the use of the settlement number is particularly unreliable and prejudicial to WaterRower in that Ms. Parente's reliance on it is in derogation of the Settlement Agreement's clear language plainly stating that JBI agreed that WaterRower was settling to avoid further litigation expense and that WaterRower's "payment made is not to be construed as an admission of liability."  Stern Dec., Ex. 22 ¶ 7.  Nor is cross examination the cure – while Ms. Parente is clearly a competent expert in her field, she is not qualified to explain to the jury the complicated legal, factual and strategic nuances that are woven into the fabric of any settlement agreement.

Channeling Daubert, 509 U.S. at 595, I find that the settlement number is not a "sufficient fact[]" pursuant to Fed. R. Evid. 702(b) in that it lacks the requisite indicia of reliability to be used as the foundation for an expert opinion.  I further find that it is precisely the kind of fact that creates serious danger of "unfair prejudice, confusion of the issues, or

misleading the jury" for which Fed. R. Evid. 403 was designed and which, as Daubert teaches, experts must be precluded from perpetuating.  See Daubert, 509 U.S. at 595 (internal quotation marks omitted).  Therefore, I recommend that the Court order that Ms. Parente must delete the portion of her Report that relies on the settlement number, recalculate her hypothetical royalty rate and actual damages and reissue her Report, as well as that she is precluded from testifying to actual damages in reliance on commission payments grounded solely in the settlement number.  Otherwise, I recommend that the Daubert motion be denied.

## V.     Conclusion

Based on the foregoing, I recommend that WaterRower's Daubert motion to exclude the Report and expert testimony of Catherine Parente (ECF Nos. 56, 61 (sealed version)) be granted in part and denied in part.  Any objections to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen days of service of this report and recommendation.  See Fed. R. Civ. P. 72(b); DRI LR Cv 72.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See Brenner v. Williams-Sonoma, Inc., 867 F.3d 294, 297 n.7 (1st Cir. 2017); Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 23, 2025